UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEW ERA ENTERPRISES, INC.,

        Plaintiff,                         Hon. Ellen S. Carmody

v.                                         Case No. 1:03-CV-873

EDWARD KACOS, et al.,

        Defendants.
_____/

**OPINION**

        This matter is before the Court on the Motion for Summary Judgment by Edward Kacos and the Estate of Edwin Kacos. (Dkt. #98). As discussed herein, the Court **grants** the motion.

**BACKGROUND**

        On February 19, 2002, New Era Enterprises, Inc. executed a promissory note in the amount of one million dollars ($1,000,000) payable to Trade Partners Gateway LLC (the Gateway note). (Dkt. #1, Exhibit 1). Interest accrued on this note at the rate of 7.5 percent annually and was payable in quarterly installments. The note was scheduled to mature on February 19, 2005, at which point the entire amount of principal and any outstanding interest was to be paid. *Id.*

        On April 15, 2002, New Era executed a promissory note in the amount of four hundred thousand dollars ($400,000) payable to Trade Partners Greenville LLC (the Greenville note). (Dkt. #1, Exhibit 3). Interest accrued on this note at the rate of 7.5 percent annually and was payable in quarterly

installments. The note was scheduled to mature on April 15, 2005, at which point the entire amount of principal and any outstanding interest was to be paid. *Id.*

As discussed in detail below, the Gateway note was subsequently assigned to Edwin Kacos and the Greenville note was subsequently assigned to Edward Kacos. (Dkt. #1, Exhibits 2, 4). Following these assignments, New Era paid to the Kacoses the interest payments required by the notes. On October 31, 2003, however, the Receiver moved the Court for injunctive relief to prevent New Era from making future payments on these notes to the Kacos brothers and, furthermore, to compel the Kacos brothers to refund the amounts previously received pursuant to the notes. *Quilling v. Trade Partners*, Case No. 1:03-cv-236, Dkt. #278 (W.D. Mich.). On November 17, 2003, the Court denied the Receiver's request. *Id.* at Dkt. #302.

On December 5, 2003, New Era initiated the present interpleader action, seeking resolution of the dispute between the Receiver and the Kacos brothers as to proper payment of the amounts owing under the Gateway and Greenville notes. (Dkt. #1). On February 9, 2004, the Receiver asserted various counterclaims against the Kacos brothers. (Dkt. #10). In short, the Receiver asserts that the purported assignments of the notes fails as a matter of law and that, therefore, the monies owing under the notes (both interest and principal) must instead be paid to the Receiver. *Id.*

On October 17, 2005, the parties agreed to dismiss New Era (including the various counterclaims asserted against it) from this action. (Dkt. #113). The Kacoses have now moved for summary judgment as to the counterclaims asserted against them by the Receiver. For the reasons articulated herein, the Court **grants** the Kacos' motion.

**LEGAL STANDARD**

In reviewing a motion for summary judgment, the Court must confine itself to the narrow questions of whether there exist "no genuine issue[s] as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a Rule 56 motion, the Court cannot try issues of fact, but is empowered to determine only whether there exist issues in dispute to be decided in a trial on the merits. *See Perez v. Aetna Insurance Co.*, 96 F.3d 813, 819 (6th Cir. 1996); *Aiken v. The City of Memphis*, 37 F.3d 1155, 1161 (6th Cir. 1994). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also*, *Terry Barr Sales Agency v. All-Lock Co. Inc.*, 96 F.3d 813, 819 (6th Cir. 1996) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989)).

A motion for summary judgment requires the Court to view "inferences to be drawn from the underlying facts...in the light most favorable to the party opposing the motion." *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also*, *Terry Barr Sales Agency*, 96 F.3d at 819; *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir. 1996). The opponent, however, has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir. 1989) (quoting *Matsushita Electric Ind. Co.*, 475 U.S. at 587); *see also*, *Schaffer*, 74 F.3d at 727.

As the Sixth Circuit has recognized, the Supreme Court has encouraged the granting of summary judgments, as such may be "an appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Kutrom v. City of Center Line*, 979 F.2d 1171, 1173 (6th Cir. 1992).

Consistent with this concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd Board of Education*, 106 F.3d 135, 140 (6th Cir. 1997). Furthermore, mere allegations do not suffice. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989) ("the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact").

## I.        Judicial Estoppel

The Kacoses assert that the doctrine of judicial estoppel should be employed to preclude the Receiver from asserting the arguments which form the basis of his counterclaims. Judicial estoppel is "an equitable doctrine invoked by a court at its discretion. . .to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). Specifically, judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 424 (6th Cir., July 6, 2005) (quoting *New Hampshire*, 532 U.S. at 749). The doctrine is designed to protect the integrity of the judicial process "by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 623 (6th Cir. 2005) (quoting *New Hampshire*, 532 U.S. at 749-50).

Courts are warned, however, to cautiously invoke judicial estoppel because its application completely precludes an examination of the merits of the arguments to which the doctrine is applied. *See Teledyne Industries, Inc. v. National Labor Relations Board*, 911 F.2d 1214, 1218 (6th Cir. 1990). Accordingly, judicial estoppel should be applied only where a party's position is "clearly inconsistent

with its earlier position." *Carroll*, 399 F.3d at 624 (quoting *New Hampshire*, 532 U.S. at 750).  While the Court is not persuaded by the Receiver's arguments in this matter, the Court is likewise not persuaded that the Receiver's position in this matter is sufficiently inconsistent with previous assertions or arguments to completely preclude him from asserting such.

As the Kacoses correctly observe, the Receiver has previously made numerous factual assertions calling into question the manner in which Trade Partners conducted its affairs.  For example, the Receiver has characterized Trade Partner's operating structure as "truly Byzantine" and claimed that "Trade Partners routinely co-mingled funds."  (Dkt. #111, Exhibit 38 at 2).  The Receiver has asserted that "the Trade Partners principals created an elaborate and interconnected corporate structure of limited liability companies and trusts through which they conducted the operation of the enterprise." (Dkt. #111, Exhibit 40 at 6).  The Receiver has further asserted that "the business activities conducted by Trade Partners were, indeed, fraudulent."  (Dkt. #111, Exhibit 43 at 1-2).  The Receiver has neither repudiated these assertions in the present matter nor asserted facts which are clearly inconsistent with such.

With respect to the Receiver's arguments in this matter, it is important to distinguish between *unpersuasive* positions and *inconsistent* positions because the doctrine of judicial estoppel bars only the latter.  The Receiver's counterclaims in this matter are premised on recognition of the alleged separate corporate identities of Trade Partners, Trade Partners Gateway LLC, and Trade Partners Greenville LLC.  The Receiver has not previously taken the position that the Court should disregard the separate corporate identities of these (or any other) Trade Partners entities.  Instead, in support of his request to "pool" Trade Partners' assets, the Receiver argued that certain assets held by various Trade Partners-related entities should - for purposes of the receivership - be considered assets of Trade

Partners. As the Receiver correctly observes, this argument was neither premised on, nor required, a finding that the separate corporate identities of the relevant entities should be disregarded.

While many of the *facts* asserted by the Receiver in support of his request to pool Trade Partners' assets support the Kacos' position in this matter, such does not render completely inconsistent the Receiver's *legal* positions in the two matters. The doctrine of judicial estoppel is a rather harsh remedy, and in the Court's estimation it does not apply simply because a party asserts a legal position which does not enjoy the support of every fact previously asserted. In other words, judicial estoppel precludes inconsistent arguments, but not unpersuasive arguments. The Receiver, therefore, is not estopped from asserting his arguments in this matter. As discussed below, however, the Court finds the Receiver's arguments unpersuasive.

**II.        The Receiver's Claims**

The Receiver has asserted several counterclaims against the Kacoses. The Receiver first asserts that the assignment of the Greenville and Gateway notes fail for lack of consideration. (Dkt. #10 at ¶¶ 28-35). The Receiver asserts that the assignment of these notes constitutes waste of the corporate assets of Trade Partners Gateway LLC and Trade Partners Greenville LLC. *Id.* at ¶¶ 36-41. The Receiver also asserts that the assignments at issue constitute improper conversion. *Id.* at ¶¶ 42-45. Finally, the Receiver asserts that the purported assignments constitute a fraudulent transfer of the corporate assets of Trade Partners Gateway LLC and Trade Partners Greenville LLC. *Id.* at ¶¶ 46-49. The Receiver requests that the assignments at issue be rescinded and that ownership of the notes in question be awarded to the Receiver. The Receiver also seeks restitution for the amounts previously

paid pursuant to these assignments. Before analyzing the Receiver's arguments, a brief discussion of the circumstances regarding the assignments is necessary.

        A.      Edwin Kacos and the Assignment of the Gateway Note

As of June 2001, Edwin Kacos had more than 1.89 million dollars invested in Trade Partners. (Dkt. #101, Exhibit 7). Of this amount, $405,400 constituted loans from Edwin Kacos to Trade Partners (the "inventory loans"). (Dkt. #101, Exhibits 7, 13-17). Of the remaining amount invested, more than $740,000 was guaranteed (the "Sojkara investments"). (Dkt. #101, Exhibits 7, 12). These loans and guaranteed investments constituted financial obligations to Trade Partners. To reduce its debt to Edwin Kacos, Trade Partners, on May 3, 2002, assigned its interest in the Gateway note to Edwin Kacos. (Dkt. #101, Exhibit 8 and Exhibit 35 at 59-61, 167-68). In return, Edwin Kacos cancelled $310,163.05 in inventory loans made to Trade Partners and cancelled $506,278.765 in guaranteed Sojkara investments. *Id.*

        B.      Edward Kacos and the Greenville Note

In April 2001, Edward Kacos invested $555,759.11 in the Sojkara program. (Dkt. #101, Exhibits 18, 23). This investment was also guaranteed. *Id.* As of May 22, 2002, Trade Partners owed $534,871.81 to Edward Kacos on this investment. (Dkt. #101, Exhibit 19). Seeking to further reduce its debt burden, or at least shift it, Trade Partners assigned its interest in the Greenville note to Edward Kacos. (Dkt. #101, Exhibits 19-22). In return, Edward Kacos cancelled $534,871.81 in debt. *Id.*

        C.        The Kacoses Provided Adequate Consideration for the Gateway and Greenville Notes

The Receiver seeks to rescind the assignments at issue on the ground that the Kacoses failed to give consideration therefor. The Receiver does not assert that the consideration given in return for the assignments was inadequate (i.e., that the Kacoses purchased the assignments at an unreasonable or unfair discount), but that the Kacos brothers gave "no consideration" in return for these assignments. According to the Receiver, while Edwin Kacos and Edward Kacos each surrendered something of value in the transactions, because such consideration was given to Trade Partners instead of the Gateway or Greenville entities the transactions fail as a matter of law.

The Receiver's argument is, therefore, premised on recognition of the alleged separate corporate identities of Trade Partners, Trade Partners Gateway LLC, and Trade Partners Greenville LLC. As the Receiver acknowledges, however, "respect for the distinct identity of separate corporate entities" is not accorded where there exists "abuse of the corporate form." (Dkt. #101 at 13). There is no doubt that the corporate form was abused (or more appropriately completely disregarded) in this matter. For the Receiver to argue otherwise simply flies in the face of the facts - including those previously submitted (and relied upon) by the Receiver himself.

Under Michigan law, the allegedly distinct identities of separate corporate entities will be disregarded where one entity has become a "mere instrumentality" of another and the "otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some other clearly overriding public policy.'" *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995). As the Kacoses correctly assert, for the Receiver to now assert that the Gateway and Greenville LLCs were legitimate corporations (separate and distinct from Trade Partners), rather than "mere

instrumentalities" of Trade Partners, utilized as part of a scheme to defraud investors, enjoys no support in the record.

Thomas Smith was deposed at length in this matter. His testimony, in relevant part, reveals the following. The origin of the Gateway note is the Desert Carmel property purchase. (Dkt. #101, Exhibit 35 at 48). While Trade Partners Gateway held the title to the Desert Carmel property, the property was purchased by Trade Partners. *Id.* at 44. Trade Partners bought the property for 5.1 million dollars, none of which was paid by Trade Partners Gateway. *Id.* at 127-28. The transaction was negotiated by Trade Partners and the financing for the transaction was secured by Trade Partners. *Id.* at 117-18, 130-32. The down payment for the property was paid by Trade Partners which received $215,000 at closing. *Id.* at 122, 131-32.

Trade Partners - not Trade Partners Gateway - marketed the Desert Carmel property because Smith considered the property to be an asset of Trade Partners. *Id.* at 118, 125-27, 137-40. Accordingly, the Desert Carmel property was identified as an asset on *Trade Partners'* balance sheet. *Id.* at 119. In fact, Trade Partners Gateway did not maintain any records of its own because it was considered an arm of Trade Partners subject to its complete control. *Id.* at 138, 156-57. According to Smith, Trade Partners Gateway was created as a convenience to hold title to the property in an attempt to shield Trade Partners from any potential liability arising therefrom. *Id.* at 118. Trade Partners Gateway had no separate office space, employees, phone numbers, or bank accounts. *Id.* at 119-20, 156. Its obligations were paid by Trade Partners and Trade Partners considered any monies flowing to Trade Partners Gateway to be an asset of Trade Partners. *Id.* at 120, 157.

An examination of Smith's testimony regarding the Greenville transaction reveals similar findings. The Greenville note originated out of the Greenville warehouse purchase. *Id.* at 145-46.

Again, while Trade Partners Greenville held title to the warehouse, the property was purchased by Trade Partners. *Id.* at 146-50. Trade Partners secured the financing for the transaction and all of the obligations which - on paper - were borne by Trade Partners Greenville were, in fact, paid by Trade Partners. *Id.* at 146-52. Trade Partners made all of the decisions regarding the development of the warehouse because it was considered to be an asset of Trade Partners. *Id.* at 153.

Just as with the Desert Carmel property, the Greenville warehouse was identified as an asset on *Trade Partners'* balance sheet. *Id.* at 119. Trade Partners Greenville did not maintain any records of its own because it was considered an arm of Trade Partners subject to its complete control. *Id.* at 138, 156-57. Trade Partners Greenville had no separate office space, employees, phone numbers, or bank accounts. *Id.* at 119-20, 156. Its obligations were paid by Trade Partners and Trade Partners considered any monies flowing to Trade Partners Greenville to belong to Trade Partners. *Id.* at 120, 157.

Consistent with this testimony, the Receiver has asserted that Trade Partners was "intentionally" operated so as to "conceal the true ownership and use of funds." (Dkt. #111, Exhibit 39 at 25). The Receiver has acknowledged that Trade Partners controlled the Gateway and Greenville entities and that monies flowing to these entities "went into [Trade Partners'] pot." *Id.* at 30, 69. As the Receiver later asserted, "the Trade Partners principals created an elaborate and interconnected corporate structure of limited liability companies and trusts through which they conducted the operations of their enterprise." (Dkt. #111, Exhibit 40 at 6).

In sum, there can be no doubt that Trade Partners Gateway and Trade Partners Greenville were "mere instrumentalities" of (and completely controlled by) Trade Partners. That these instrumentalities were employed to "subvert justice" is likewise beyond doubt. As the Receiver has correctly observed, Trade Partners engaged in "rampant fraud" and is best characterized as an illegal

"Ponzi" scheme. (Dkt. #111, Exhibit 43 at 1-2; Exhibit 47 at 29-30, 90). Thus, there exists no basis for recognizing Trade Partners Gateway and Trade Partners Greenville as corporate entities separate and distinct from Trade Partners. Accordingly, the consideration which the Kacoses paid to Trade Partners in return for the assignment of the notes at issue constitutes legally sufficient consideration. Thus, the Receiver's argument that the assignments fail for lack of consideration is without merit.

Having reached this conclusion, the Receiver's other arguments simply fall of their own weight. The Receiver's argument that the assignments in question constitute waste of the corporate assets of Trade Partners Gateway LLC and Trade Partners Greenville LLC is without merit because those entities possessed no assets and are not properly considered entities separate and distinct from Trade Partners. Likewise, the Receiver's claim that the assignments at issue constitute the improper conversion and fraudulent transfer of assets belonging to Trade Partners Gateway LLC and Trade Partners Greenville LLC is of no merit. In sum, for the reasons articulated herein, the Court finds that the assignments of the Gateway and Greenville notes were properly undertaken and that the Kacos brothers provided sufficient consideration therefor. Accordingly, the Court concludes that the Kacoses are entitled to summary judgment as to the counterclaims asserted by the Receiver.

**CONCLUSION**

For the reasons articulated herein, the Court concludes that the <u>Motion for Summary Judgment by Edward Kacos and the Estate of Edwin Kacos</u>, (dkt. #98), must be **granted**. Accordingly, this matter is dismissed. An Order consistent with this Opinion will issue.


Date:  March 24, 2006                                        /s/ Ellen S. Carmody
                                                                          ELLEN S. CARMODY
                                                                          United States Magistrate Judge